FILED

2023 Feb-27  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

KIM SMITH,          }
                 }
    Plaintiff,      }
                 }
v.                 }     Case No.:  2:17-cv-00411-MHH
                 }
THE SALVATION ARMY,    }
A Georgia Corporation,    }
                 }
    Defendant.    }
                 }

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

KIM SMITH,          }
                 }
    Plaintiff,      }
                 }
                 }     Case No.:  2:18-cv-01342-MHH
v.                 }
                 }
THE SALVATION ARMY, et al,    }
                 }
    Defendants.    }
                 }

## <u>MEMORANDUM OPINION</u>

In her complaint, Kim Smith asserted several employment-law claims against

her former employer, The Salvation Army.  Ms. Smith and The Salvation Army have

1

settled her gender-based discrimination and retaliation claims and her Equal Pay Act claim. (Doc. 87, p. 3; *see also* Doc. 81). The Salvation Army has asked the Court to enter judgment in its favor on Ms. Smith's remaining claims for race discrimination and retaliation under Title VII and 42 U.S.C. § 1981. (Doc. 87).[1]

This opinion resolves The Salvation Army's summary judgment motion. The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment. Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted and presents the evidence in the light most favorable to Ms. Smith. Finally, the Court evaluates the evidence under the legal standards that govern Title VII and § 1981 race discrimination and retaliation claims.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

---

[1] CM/ECF docket citations are for case 2:17-cv-00411.

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences from that evidence in favor of the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021).

## II.

The Salvation Army is "part of the universal Christian Church." (Doc. 52-4, p. 11). The Salvation Army has approximately 26,000 officers who supervise

approximately 125,000 employees.  (Doc. 56-1, p. 13).  Officers have the rank of Lieutenant, Captain, or Major.  (Doc. 56-1, pp. 13-14).

As part of its mission, The Salvation Army runs thrift stores.  (Doc. 64-124, p. 7, tp. 28).  Kim Smith is an African-American woman who began working as manager of the Green Springs Salvation Army thrift store in Homewood, Alabama in September of 2014.  (Doc. 51-2, p. 15, tp. 51).  Ms. Smith brought to the store more than two years of retail management experience and more than 20 years of retail experience.  (Doc. 51-2, pp. 14, 53, tpp. 48, 203–04).  Captain Dan Matthews, who is Caucasian, hired Ms. Smith and supervised her while she worked at the Green Springs store.  (Doc. 51-2, pp. 15, 22, tpp. 51, 78; Doc. 51-11, p. 3).  Tom Fernekes, who is Caucasian, was assistant manager at the Green Springs store.  (Doc. 51-2, p. 27, tp. 100; Doc. 51-33, p. 20, tp. 78).

In December of 2014, Captain Matthews promoted Mr. Fernekes to manager of the Salvation Army thrift store in Hoover, Alabama.  (Doc. 64-75, p. 9, tpp. 34-35; Doc. 64-75, pp. 4, 6, tpp. 13, 22, 24).  Ms. Smith did not have an opportunity to apply for the position.  (Doc. 51-15, p. 2).  Mr. Fernekes had no managerial experience, but he had worked at Home Depot for more than two years and practiced law for three years as a private attorney.  (Doc. 64-75, p. 8, tpp. 26, 32).  Shortly after Mr. Fernekes became manager of the Hoover store, Captain Preston Lewis became his supervisor.  (Doc. 64-75, p. 9, tpp. 33-34; Doc. 64-75, p. 10, tpp. 39-40).

On January 28, 2015, Captain Matthews visited the Greens Springs store because it was a sale day. Captain Matthews found that the shelves were not properly stocked. After the visit, Mr. Matthews sent an email to a co-worker to which he attached pictures that illustrated empty shelves and shelves with space for additional merchandise. (Doc. 51-8, pp. 2-11).

Two days later, Captain Matthews gave Ms. Smith a verbal warning for not opening the Green Springs store at 8:30 a.m. (Doc. 51-9, p. 1). Ms. Smith explained that she arrived at the store shortly before 8:30 and discovered that she had forgotten the store key at home. (Doc. 51-9, p. 1).[2] Captain Matthews asked Ms. Smith to alert HR when she could not open the store on time because store employees were not able to clock in on time if she was not at the store to admit them. (Doc. 51-9, p. 1). Three months before this incident, Ms. Smith had signed a written reminder that Captain Matthews sent to all employees advising them that they must notify a supervisor and HR when they were "out of work for any reason." (Doc. 51-9, p. 4).

---

[2] A written notation on the record of the January 2015 verbal warning indicates that Ms. Smith was 44 minutes late for her shift when she clocked in at 8:44 a.m. (Doc. 51-9, p. 2). Ms. Smith explained in the record of the verbal warning that she forgot the key to the store because she was going "to the store each night to keep from doing doubles." (Doc. 51-9, p. 1). A Salvation Army policy memo attached to the record of the verbal warning states in red and bold print: "Our policy is that Employees may **NOT** come to work early or stay late for any reason." (Doc. 51-9, p. 3). The memo continues: "From this point on, [a]ny one [*sic*] . . . staying on premises after punching out may be terminated from employment." (Doc. 51-9, p. 3). The copy of that memo attached to the record of Ms. Smith's verbal warning bears Ms. Smith's signature and the date October 27, 2014. (Doc. 51-9, p. 3).

On the record of the verbal warning, Ms. Smith wrote that the warning was "flat out wrong and petty."  (Doc. 51-9, p. 2).[3]

On February 2, 2015, Captain Matthews gave Ms. Smith a written disciplinary notice for poor performance for the inadequately stocked shelves on the January 28, 2015 sales day at the Green Springs store.  (Doc. 51-10, p. 1).  In the "Employee's Comments" section of the notice, Ms. Smith wrote:  "I am not signing at all.  I am shocked about being given this.  It is unfair.  I personally walked the warehouse [manager] to the area and showed her what was needed.  I did everything short of selecting items and putting them in my own vehicle.  Captain says to call him however I called him 3 times Friday 1/30/15 to no avail."  (Doc. 51-10, pp. 1-2).  On February 3, 2015, Captain Matthews sent Ms. Smith an email message in which he asked her to report deficient stock items by email and to copy Lynn Sims on the messages.  Captain Matthews indicated that Ms. Sims should reciprocate.  (Doc. 51-10, p. 5).   Ms. Sims was the assistant manager for The Salvation Army's Birmingham warehouse.  (Doc. 64-75, p. 13, tp. 51).

On February 13, 2015, Captain Matthews arrived at the Green Springs store and found Ms. Smith in the back office.  For this, Captain Matthews issued a written disciplinary notice for poor performance.   In the disciplinary notice, Captain

_____

[3] On the employee orientation form that she completed when she joined The Salvation Army, Ms. Smith acknowledged that The Salvation Army had a progressive disciple policy, and she could be disciplined for tardiness.  (Doc. 52-4, p. 12).

Matthews wrote:

> When the store opened, the rear sales floor lights had not been turned on, television shelves were sparse, while there were several televisions sitting in the warehouse and had not been put out onto the sales floor. I walked the sales floor and straightened most of the clothing hanging racks that were out of sorts and misaligned, obviously little care had been taken to walk the sales floor before opening to tidy up. Employees for the most part were standing around doing little to prep the store for opening.

(Doc. 51-11, p. 2). Captain Matthews stated that the store was "not being managed well" and suspended Ms. Smith without pay for three days. (Doc. 51-11, p. 2). He added: "If Kim continues poor performance she may be terminated." (Doc. 51-11, p. 2).

Kristin Peterson, an HR specialist for The Salvation Army, met with Ms. Smith to deliver Captain Matthews's disciplinary notice. (Doc. 51-11, p. 3). Ms. Peterson is African-American; she and Ms. Smith joined The Salvation Army at the same time. (Doc. 64-36, p. 12, tp. 48).[4] Ms. Peterson and Ms. Smith had become good friends. Ms. Peterson testified that she and Ms. Smith "talked very often" and "piggybacked off one another." (Doc. 64-36, p. 6, tp. 22). Ms. Smith disagreed with Captain Matthews's criticisms and wrote on the notice that she believed she was "being discriminated against because of [her] race" because she "never in [her] 25 year career had any poor performance issues . . . ." (Doc. 51-11, p. 3). Ms. Smith

---

[4] Ms. Peterson is now Kristin Peterson Thomas. The Court uses Ms. Thomas's maiden name in this opinion to conform to the summary judgment evidence.

added that she had "talked to Tom [Fernekes]," and she knew "that pictures ha[d] not been taken at his store and he ha[d] not been visited nor written up for any such things" as she had "because [Captain Matthews] is a white manager and I am black." (Doc. 51-11, p. 3; *see also* Doc. 64-75, p. 13, tp. 51).  Ms. Smith stated that while Mr. Fernekes worked with her at the Green Springs store, there were no incidents, and she did not receive disciplinary notices; "[t]his has all started after Tom was promoted and took over" the Hoover store.  (Doc. 51-11).[5]

One week later, on February 20, 2015, Ms. Smith filed an EEOC charge against The Salvation Army.  (Doc. 51-15).  Ms. Smith reported that Mr. Matthews had discriminated against her because of her race when he gave her several writeups and promoted Mr. Fernekes to manager of the Hoover store, a position in which Ms. Smith was interested.  (Doc. 51-15, p. 2).  Ms. Smith alleged that store manager Jessica Perry, who is Caucasian, did not receive writeups even though she was late

---

[5] Mr. Fernekes testified that he believed Captain Matthews "was an absolutely horrible administrator" because he did not communicate well, and he "seemed to yell a lot." (Doc. 64-75, p. 5, tpp. 18-19).  Mr. Fernekes stated that the "business model was not improving," and Captain Matthews "had no earthly idea what to do about it." (Doc. 64-75, p. 5, tp. 19).  Mr. Fernekes testified that there was "a noticeable difference" between the way Captain Matthews treated him and the way Captain Matthews treated Ms. Smith. (Doc. 64-75, p. 5, tp. 19).  Mr. Fernekes "got the impression" that Captain Matthews "did not like women." (Doc. 64-75, p. 5, tp. 19).  Mr. Fernekes recalled an incident while he was assistant manager at the Green Springs store in which Captain Matthews "got on [Ms. Smith] pretty good" and publicly disciplined her in front of other employees. (Doc. 64-75, pp. 9-10, tp. 35).  Mr. Fernekes stated:  "My experience was seeing" Captain Matthews "not treat women as well.  Knowing him for a period of time, I have little doubt that it has to do with" Ms. Smith's "being a person of color." (Doc. 65-75, p. 6, tp. 21).  Mr. Fernekes did not see Captain Matthews criticize other Black female employees at the Green Springs store or in the Salvation Army office. (Doc. 64-75, p. 10, tp. 38).

for work many times.  (Doc. 51-15, p. 2).  On March 23, 2015, Ms. Peterson texted Ms. Smith to let her know that The Salvation Army had received her (Ms. Smith's) EEOC charge.  (Doc. 64-42, p. 1).  Ms. Peterson advised Ms. Smith that she would email the charge "to ATL Command" and copy Captain Matthews on the message.  (Doc. 64-42, p. 1).[6]

On April 10, 2015, Ms. Smith met with Captain Matthews and Ms. Peterson in Ms. Peterson's office to discuss Ms. Smith's performance at the Green Springs store.  (Doc. 51-12, p. 1).  In a memo that she prepared after the meeting, Ms. Peterson wrote that Ms. Smith was "very nonchalant" during the meeting and "gave very little input into the conversations."  (Doc. 51-12, p. 1).  Captain Matthews communicated "Major Vick's concern" that Ms. Smith was absent during a scheduled store assessment and that she had not requested that day off.  (Doc. 51-12, pp. 1-2).  Ms. Smith reported that she had worked 11-12 hour shifts to prepare for the meeting "because the store was in such disarray."  (Doc. 51-12, p. 1).  Captain Matthews asked Ms. Smith to communicate better, and Ms. Peterson reiterated the importance of communication by, for example, copying direct managers on emails to HR personnel concerning requested leave.  Ms. Smith explained that she did not feel comfortable communicating with Captain Matthews because he had suspended

---

[6] The Salvation Army submitted its formal response to the charge to the EEOC on April 14, 2016. (Doc. 52-4).  The EEOC completed its investigation on December 16, 2016 and gave Ms. Smith a right-to-sue letter.  (Doc. 51-16, p. 4).

her.  Ms. Peterson thanked Ms. Smith for coming to her office.  (Doc. 51-12, p. 2).[7]

Ms. Smith agreed to copy Captain Matthews on email messages.  (Doc. 51-2, p. 36,

tp. 135).

Later in 2015, Captain Preston Lewis and Captain Karen Lewis became Ms.

Smith's supervisors at the Green Springs store.  During a November 12, 2015

production meeting attended by Captains Preston and Karen Lewis, Mr. Fernekes,

and one other employee, Ms. Smith complained that her staff was thinking about

quitting.  Ms. Smith stated that store employees feared losing their jobs because

Captain Preston Lewis had spoken to two employees after he saw them return to the

store after their shift to pick up a television.[8]  (Doc. 52-3, p. 1).

A month earlier, on October 5, 2015, Mr. Fernekes had received from Captain

Preston Lewis a written disciplinary warning that followed a warning in July 2015,

a warning in August 2015, and two warnings in September 2015.  (Doc. 64-75, pp.

10-11, tpp. 38-39, 41-42; Doc. 64-80).  Captains Preston and Karen Lewis were

visiting the Hoover store almost daily.  (Doc. 64-75, p. 10, tp. 40).  The October 5

---

[7] Ms. Smith disputes some of the details of the written account of the meeting.  (Doc. 51-2, pp. 35-
36, tpp. 133–34).  She testified that she did not cry in the meeting, and she did not say that her
professional relationship with Captain Matthews had been fine before her suspension or that the
suspension had broken her heart.  (Doc. 51-2, p. 36, tp. 134).

[8] Following the production meeting, Ms. Smith denied acknowledging at the production meeting
that customers were paying store employees to deliver merchandise.  (Doc. 52-3, p. 4).  Captain
Lewis obtained statements from Mr. Fernekes and the other employee in which each man
confirmed that Ms. Smith stated in the meeting that she was aware that store employees "were
being paid by customers to deliver items."  (Doc. 52-3, p. 3; *see also* Doc. 52-3, p. 6).

warning stated that, "[a]fter repeatedly advising and warning" Mr. Fernekes of "issues of substandard customer service" at the Hoover store, employees at the store continued to ignore customers, and Mr. Fernekes had a "practice" of closing the store at 7:45 though the posted closing time was 8:00. (Doc. 64-80, p. 1). The warning states: "Please be reminded that this written write up is in addition to the numerous verbal warnings you have received." (Doc. 64-80, p. 2). Mr. Fernekes was advised: "If these matters are not reconciled immediately, this will result in additional administrative action up to and including termination []." (Doc. 64-80, p. 2).

Mr. Fernekes received additional warnings on October 10 and November 3, 2015. (Doc. 64-75, p. 11, tpp. 41-42). He received a written final warning on November 10, 2015, two days before the production meeting at which Ms. Smith complained that her store employees were thinking about quitting because Captain Preston Lewis had questioned two employees. (Doc. 64-75, p. 11, tp. 41).[9] In December 2015, Mr. Fernekes either was fired or he resigned because he knew that Captain Lewis was planning to fire him. (Doc. 51-2, p. 34, tpp. 126-27; Doc. 64-75, p. 12, tp. 45).[10]

The Salvation Army hired Jason Dothard, a Caucasian, to replace Mr.

---

[9] Ms. Smith testified that she did not know of an instance when a Salvation Army officer wrote up Mr. Fernekes, and she believed that Mr. Fernekes would have told her had he been written up. (Doc. 51-2, p. 34, tp. 126).

[10] Ms. Smith testified that Ms. Peterson told her that Mr. Fernekes was fired. Mr. Fernekes testified that he resigned because he knew that Captain Preston Lewis was about to fire him.

Fernekes.  (Doc. 51-33, pp. 4, 20, tpp. 15, 78-79).  On his written job application, Mr. Dothard disclosed that he had been convicted of burglary and possession of a forged instrument in 2005.  (Doc. 64-16, p. 4).  A background check revealed that Mr. Dothard had several prior felony convictions between 1989 and 2011.  (Doc. 64-17).  After HR Director Mark McAfee completed Mr. Dothard's background check and discovered the additional felonies, Mr. McAfee sent Captain Lewis a letter on February 3, 2016 in which he stated that Mr. Dothard could not work as a store manager because of his criminal record, but he could work in a low-risk position. (Doc. 64-18, p. 1).  Mr. McAfee indicated that Mr. Dothard would have to appeal to remain employed with The Salvation Army.  (Doc. 64-18).

Mr. Dothard wrote an appeal letter in which he explained that his criminal history stemmed from a period in which he was addicted to drugs.  Mr. Dothard stated that after he graduated from a recovery program, he went to work for another company that operated thrift stores and worked his way up from truck driver to general manager of an 80,000 square foot store and donation center where, after a few months as manager, the store's weekly gross income increased by $18,000. (Doc. 64-19, p. 2).  Captain Lewis forwarded Mr. Dothard's letter to Mr. McAfee with a cover letter dated February 18, 2016.  In the cover letter, Captain Lewis urged HR to allow Mr. Dothard to manage the Hoover store because Mr. Dothard was responsible for a 30% increase in weekly sales at the store, and Captain Lewis

believed that Mr. Dothard had put his addiction behind him.  (Doc. 64-19, p. 1).  Mr. Dothard was offered to opportunity to resign as the Hoover store manager on April 6, 2016.  (Doc. 64-22).[11]

Two days after Mr. Dothard resigned, Ms. Smith moved to the Hoover store as its manager.  (Doc. 51-2, p. 34, tp. 129).  A Black man replaced Ms. Smith as manager of the Green Springs store.  (Doc. 51-2, p. 35, tp. 130).[12]  When she moved to the Hoover store, Ms. Smith requested a two dollar raise; she was earning $13.26 per hour.  On April 15, 2016, Ms. Peterson texted Ms. Smith to let her know that management had discussed offering Ms. Smith $15 per hour to manage the Hoover store.  Ms. Peterson advised Ms. Smith to "really think about it" before she accepted the offer because it would "be good on the front end for u. but would make your lawsuit weak against us if u accept!"  (Doc. 64-42, p. 3).  Ms. Smith replied that she had discussed her options with her attorney, and her attorney indicated that either store "was OK."  (Doc. 64-42, p. 4).  Ms. Peterson cautioned Ms. Smith:  "don't say nothing and act surprise[d] like u knew nothing when we come to visit today.! [*sic*]"

---

[11]  There appears to be a mistake on Mr. Dothard's personnel action form.  Ms. Peterson wrote on the form that The Salvation Army accepted Mr. Dothard's resignation letter on April 4, 2016, but she dated her report April 6, 2016.  (Doc. 64-22).  Ms. Peterson texted Ms. Smith on April 5, 2016 to give Ms. Smith notice that The Salvation Army was planning to "let [Mr. Dothard] go" the following day, meaning April 6, 2016.  Ms. Peterson wrote:  "Captains would like for u to report to Hoover tomorrow morning at 8:30."  (Doc. 64-42, p. 2).  Thus, the April 4 date on Mr. Dothard's personnel action form seems to be a mistake.

[12] The next manager at the Green Springs store was a Caucasian woman.  (Doc. 51-2, p. 35, tp. 131).

(Doc. 64-42, p. 5).  Ms. Smith received a raise to $15.62 per hour on April 19, 2016 from Captains Preston and Karen Lewis.  (Doc. 51-2, p. 40, tp. 150; Doc. 52-5, p. 18).

On June 27, 2016, Captain Preston Lewis met with Ms. Smith to deliver her annual review for April 2015-April 2016.  (Doc. 64-103).  Captain Lewis ranked Ms. Smith as exceeding expectations in all areas except human resources.  (Doc. 64-103, pp. 1-3).  Captain Lewis wrote that Ms. Smith had "risen to the top," and that she was a "proven professional."  (Doc. 64-103, p. 1).  Captain Lewis stated that Ms. Smith's store was "the cleanest its [*sic*] been in years and the staff are more responsive [than] in anyone's memory."  (Doc. 64-103, p. 2).  As areas for growth and development, Captain Lewis encouraged Ms. Smith to hold staff accountable for their actions and to work on her ability to accept criticism.  (Doc. 64-103, p. 4).  Captain Lewis wrote that he and Ms. Smith had had "a rough start in the year with [Ms. Smith's] inability to connect with [his] leadership style and methods."  (Doc. 64-103, p. 4).  Ms. Smith indicated that she was "very pleased" with her review.  (Doc. 64-103, p. 4).

On July 16, 2016, Captain Lewis emailed Ms. Smith and asked why she had not appeared for her opening shift.  (Doc. 52-5, pp. 20-21).  Ms. Smith explained that she felt ill, and she thought she was not scheduled to open the store because she looked at the wrong schedule.  (Doc. 52-5, p. 20).  Mr. Lewis reminded Ms. Smith

to pay closer attention to her schedule and stated that he hoped that Ms. Smith was feeling better.  (Doc. 52-5, pp. 20-21).

On July 28, 2016, Captain Lewis wrote to the managers of the Army's Hoover and Green Springs stores and others and emphasized that both stores had to improve sales significantly because the previous year's sales "were not sufficient to pay payroll and utilities."  (Doc. 52-5, p. 25).  Captain Lewis asked his team to keep as much product on store shelves as possible and to maintain good customer service. (Doc. 52-5, p. 25).

One month later, Captain Lewis notified Ms. Smith by email that the Hoover store's sales were significantly lower than the sales at the Green Springs store.  (Doc. 52-5, p. 23).  Captain Lewis asked Ms. Smith to investigate the reason for the differences, and he requested a meeting to discuss the issue.  (Doc. 52-5, p. 23).

On September 12, 2016, Joyce Lanzarotta, The Salvation Army's Director of Finance, noticed that there was an error in an employee's timesheet at the Hoover store.  (Doc. 52-5, p. 27).  Ms. Lanzarotta's assistant, Delilah Watson, called the store several times, but no one answered.  (Doc. 52-5, p. 27).  When she was able to reach Ms. Smith, Ms. Watson told Ms. Smith to carefully review timesheets to avoid errors.  (Doc. 52-5, p. 27).  Ms. Smith "got agitated and said, '[i]t was a mistake, everybody makes mistakes.'"  (Doc. 52-5, p. 27).  Ms. Smith explained that she was stressed because she was "doing the job of 3 managers," and Ms. Smith hung up.

15

(Doc. 52-5, p. 27).  Ms. Lanzarotta called back, but Ms. Smith did not want to discuss the phone call with Ms. Watson because she (Ms. Smith) was angry.  (Doc. 52-5, p. 29).  Ms. Smith explained that she did not want to move to the Hoover store but was not given a choice.  (Doc. 52-5, p. 29).  In a lengthy note recounting the conversation, Ms. Lanzarotta wrote that she was concerned about Ms. Smith, and she thought that Ms. Smith was "going through something else right now, maybe personal issue[s], causing this behavior."  (Doc. 52-5, pp. 29-30).

On October 19, 2016, Ms. Smith complained to Captain Lewis about a Styrofoam head that someone donated to the store.  (Doc. 64-42, pp. 7-9).  The Styrofoam head was painted black with pearlescent pins for eyes and a tangled string of lights for hair.  (Doc. 64-42, pp. 6-7).  Ms. Smith sent Captain Lewis a text message in which she wrote:  "Maury just showed me this 'blackface' was sent by someone in electronics yesterday . . they need to know this is not funny but very offensive and should have been thrown away."  (Doc. 64-42, pp. 7-8).[13]  Captain

_____

[13] "On the most basic level, blackface is the application of any prosthetic—makeup, soot, burnt cork, minerals, masks, etc.—to imitate the complexion of another race." https://www.smithsonianmag.com/arts-culture/blackface-older-you-think-180977618/ (last visited February 21, 2023).  "What we call blackface minstrelsy is a specific performance genre that developed in early 19th-century America, with the earliest performance documented in 1830. Featuring characters with names like Jim Crow, Zip Coon and Mammy, these performances comprised skits, monologues, songs and dances that supposedly imitated those of enslaved people or of the recently freed." https://www.smithsonianmag.com/arts-culture/blackface-older-you-think-180977618/ (last visited February 21, 2023).  Blackface is used "to mock or ridicule Black people"; it is considered deeply offensive. https://www.merriam-webster.com/dictionary/blackface (last visited February 21, 2023).

Lewis responded that he "[h]op[ed] they thought it was a piece of art and not more than that." (Doc. 64-42, p. 8). He said that he was "checking on it." (Doc. 64-42, p. 8). Captain Lewis then wrote: "The beneficiary said he thought it was art work, which in my opinion was its intended purpose." (Doc. 64-42, p. 9).[14] Captain Lewis acknowledged that the statue was offensive and asked Ms. Smith to remove the statue from the store. (Doc. 51-85, p. 39, tp. 155).

In the weeks that followed, the Lewises sent Ms. Smith several emails about the Hoover store. On October 26, 2016, Captain Karen Lewis sent an email to Ms. Smith about the large volume of product at the Hoover store. Captain Lewis explained that product deliveries would be heavy until The Salvation Army opened "store 3," asked Ms. Smith not to return product to the warehouse but to "start ragging out," and asked Ms. Smith to "bear with us as we transition to our new store." (Doc. 52-5, p. 34).[15] A few days later, in an email to Ms. Smith, Captain Preston Lewis wrote: "I noticed you are overwhelmed with clothes on both the

---

[14] A beneficiary is someone who participates in the Salvation Army's alcohol and drug rehabilitation program. (Doc. 64-75, pp. 4-5, tpp. 16-17). Beneficiaries work in the Army thrift stores and warehouses. (Doc. 64-75, p. 5, tp. 17).

The beneficiary who sent the statue to the Hoover store stated that he "thought it was a work of art from students downtown," that the statue was "just an unusual eye catcher," and that he believed the statue could be used in a barber or beauty shop. (Doc. 51-19, p. 1). The beneficiary had worked for an art wholesaler before joining The Salvation Army. (Doc. 51-85, p. 39, tp. 153). Captain Lewis testified that items received at the warehouse were arbitrarily sent to different stores, so the beneficiary did not know or intend that the statue would go to the Hoover store. (Doc. 51-85, p. 39, tpp. 154-55).

[15] "Ragging out" is removing old and unsold items to make space for new merchandise.

warehouse and store floor." (Doc. 52-5, p. 36). Captain Lewis explained that clothes had to be Ms. Smith's priority and that he was providing three staff members from another store for the day to help with ragouts. Captain Lewis promised to send 11 beneficiaries the following day to help Ms. Smith clear clothing racks. (Doc. 52-5, p. 36). The next day, November 1, 2016, Captain Karen Lewis sent a lengthy email message to Ms. Smith in which she reminded Ms. Smith that she needed to stay on the floor of her store and keep the store "in inspection order" because "headquarters [would] be in town frequently." Captain Lewis commented that Ms. Smith was in the back of the store pricing donations each time she visited, and Ms. Smith needed to be on the store floor "to manage effectively." (Doc. 52-5, p. 38).

On November 2, 2016, Captain Preston Lewis advised Ms. Smith by email that he had seen z-racks on the sales floor which created a tripping hazard. (Doc. 52-5, p. 40). Captain Lewis reminded Ms. Smith that one week earlier, he had asked her to remove the z-racks because he saw one blocking an emergency exit. (Doc. 52-5, p. 40). Two days later, Captain Karen Lewis asked Ms. Smith to "stop doing the little sales" because "[w]e are trying to get back on track with proper sales." (Doc. 52-5, p. 42).

On November 9, 2016, Captain Preston Lewis sent Ms. Smith an email reminding her that clothing was her priority and explaining that the decision to remove clothing racks from the store floor to make room for additional furniture was

"ill advised."  (Doc. 51-21, p. 2).  Captain Lewis added that the store should be cleaned regularly and that customer service needed to improve to relieve long lines at cash registers.  (Doc. 51-21, p. 2).  Captain Lewis indicated that on a recent visit to the store, he saw more than 30 customers in line, but Ms. Smith and her assistant manager had not opened all of the registers.  (Doc. 51-21, p. 2).

By December 2016, Ms. Peterson was coaching Ms. Smith about her interactions with Captains Preston and Karen Lewis almost daily.  Ms. Smith had let Ms. Peterson know that she was planning to transition to a new job, and Ms. Peterson was helping Ms. Smith plan her departure so that Ms. Smith could exhaust her benefits before she resigned.  For example, on December 1, 2016, Ms. Peterson texted Ms. Smith:

> Stay calm…I'm almost at your store. Captains wanted to meet with Management…you and Sky [the assistant manager at the Hoover store] about expectations. I don't really like saying anything anymore bc I always get myself in trouble. But just listen to him and stay calm. Speak your mind but stay calm! You don't want to hurt your case or quit before January 3rd as we discussed.

(Doc. 64-42, pp. 12-13).

That day, Captain Preston Lewis gave Ms. Smith a verbal warning.  (Doc. 51-22, pp. 1–2).  The "statement of the problem" section of the disciplinary notice states:

> 1) Failure to comply with safety; Failure to follow management request; After being instructed not to block emergency exit on 11/09, discovered the exit blocked again 11/28/16. 2) Unsatisfactory Performance; Store is not being cleaned on any regular basis. We have asked numerous times to pay attention to the cleanliness of your store. The furniture has

not been wiped off in weeks nor has corners of store and under racks been vacuumed. 3) Error or negligence causing financial impact; H-racks have been leaving the floor and returned to the warehouse leaving large gaps on the floor and decreasing the store revenue. We noted numerous H-racks missing from the floor. This is collaborated [*sic*] by your staff since your arrival. Additionally you informed me one was pulled 11/28 to go back to the warehouse 4) Customer Service; Not providing adequate cashiers and letting lines build up.

(Doc. 51-22, p. 1). The notice indicated that Ms. Smith had received warnings on these topics on November 9 and 25, 2016, but she had blamed staff and customers for moving racks or blocking the exits when Captain Lewis spoke with her. (Doc. 51-22, pp. 1-2). Ms. Smith refused to sign the disciplinary notice. (Doc. 51-22, p. 2).

After the December 1 meeting at the Hoover store, Ms. Peterson texted Ms. Smith: "Again, u did great. Made your point, stayed professional, stayed calm." (Doc. 64-42, p. 14). Ms. Smith responded: " It was very hard. Had u not warned me it would have been the opposite reaction from me. I appreciate the warning." (Doc. 64-42, p. 14). Ms. Peterson advised Ms. Smith that Captain Lewis likely would be checking on her "every other day," so Ms. Smith should "hold [] staff accountable. Meet with all of them about colorize and cleaning. Write up if u have to." (Doc. 64-42, p. 15).

On December 3, 2016, Captain Preston Lewis visited the Hoover store. (Doc. 52-5, p. 48). That evening, Ms. Smith texted Ms. Peterson:

> Sorry to bother you but I need some advice..I feel that I'm being harassed by this man and I am at my limit..he's been emailing since yesterday copying you about the missing jewelry door which I told him Skye removed the only door that was on there

(Doc. 64-42, p. 16).[16]  Ms. Peterson responded:

> Don't go into much detail with him from now on…your answers should be straight to the point. He doesn't like feeling less than a man and the way you stood up to him.

(Doc. 64-42, p. 18).  Ms. Smith wrote:

> I am trying to hang in there for these lasts [*sic*] weeks but I don't think I can.. I want to tell him to his face this is harassment and this is the same thing Matthews did to me and I refuse to take it from him too

(Doc. 64-42, p. 20).  Ms. Peterson advised:

> [Captain Lewis] will continue to harass you by email…he does Bill the same way. But after he sends Bill emails they go out for lunch or to gun shows. [. . .] On Monday call Atlanta and speak to Mark McAfee to let them hear your concerns.  They are only hearing [Captain Lewis]….he has talked to them everyday this week about you…so that's all they know what he's said. Also included [sic] all of this in your lawsuit. When are you leaving on vacation?

(Doc. 64-42, pp. 20-21).[17]  Later in the text exchange, Ms. Peterson wrote:

> Nevermind on calling Atlanta. I don't think it'll do any good. Mark McAfee is the director of HR but he's just as sneaky as them Captains…I don't trust him. Yep when that Captain don't like someone

---

[16] On December 2, 2016, Captain Preston Lewis sent Ms. Smith an email message in which he stated that her refusal to sign the written record of the December 1, 2016 verbal warning did not nullify the warning.  He asked Ms. Smith to investigate why the doors to the jewelry case were missing and "to find out why the H-racks have been removed from the floor and put a stop to it." (Doc. 51-21, p. 3).

[17] "Bill" is not identified in the record.

he keeps picking and picking…everyone he has fired he has harassed them like [. . .] Yep but he seems to be going at you the hardest from my eyes.

(Doc. 64-42, pp. 23, 25).   Though she was trained to send a complaint of discrimination or harassment "directly to command or headquarters," Ms. Peterson did not report Ms. Smith's December 2016 complaints to Mr. McAfee.  (Doc. 64-36, p. 6, tpp. 21-22).[18]

At 8:30 a.m. on December 5, 2016, Ms. Peterson texted Ms. Smith and advised her:

Make sure your staff has put out the week old clothes that captain talk[ed] about Saturday that were in the back of the store.  He's coming over this afternoon to re-check.

(Doc. 64-42, p. 27).  Later that morning, Ms. Smith texted Ms. Peterson:  "I have an appt tomorrow with my attorney, she is filing a retaliation claim against this Captain.  Thanks for all the help and warnings."  Ms. Peterson replied:  "Ok.  Good.  And tell

_____

[18] Under The Salvation Army's employee policies in 2015 and 2016, if an employee believed she was experiencing discrimination or harassment, she was to report her concerns to her manager, Captains Preston and Karen Lewis in Ms. Smith's case, or to an HR professional in the employee's location.  (Doc. 64-127, p. 7, tp. 25).  The employee orientation form that Ms. Smith signed when she became an Army employee states:

The Salvation Army strongly urges the reporting of all incidents of discrimination/harassment, as a result of your . . . race . . . The Complaints should be filed in writing with their immediate supervisor or the Human Resources Department.  Please refer to the Employee Manual section 3.2 and the ARC Appendix, Discrimination/Harassment at Work section, page 5.

(Doc. 52-4, p. 11); *see also* (Doc. 56-1, pp. 24-25) (TSA Southern Territory Anti-Discrimination Policy); (Doc. 56-1, pp. 26-27) (TSA Southern Territory Anti-Harassment Policy).

her to put hostile work environment also." (Doc. 64-42, p. 28). Ms. Smith wrote: "My attorney said she hope[s] he fires me." (Doc. 64-42, p. 32). Ms. Smith added: "I'm actually starting a new job mid-January so now it would be ok . . Only don't want termination on my record. I'm not announcing new job yet I gotta make Jan 3 first." (Doc. 64-42, p. 32). Ms. Peterson told Ms. Smith that the captains were documenting everything that she (Ms. Smith) and three senior citizens at the Homewood store were doing and recommended that Ms. Smith document her interactions with the captains. (Doc. 64-42, pp. 33-34, 37).[19] Just before 11:00 a.m., Ms. Peterson texted Ms. Smith to let her know that she (Ms. Peterson) and Captain Lewis were on their way to the store. Later that afternoon, Captain Preston Lewis sent Ms. Smith an email about his December 3 visit. Captain Lewis asked why racks of clothing dated November 28 had been in the back room for one week instead of being moved to the sales floor. (Doc. 52-5, p. 48).

On December 7, 2015, Captain Preston Lewis sent Ms. Smith an email in which he indicated that Ms. Smith had not responded to his December 5 message

---

[19] Ms. Peterson indicated that the three employees at the Homewood store were on a 30-day improvement program. (Doc. 64-42, p. 34). While Ms. Smith worked for The Salvation Army, the Army had "a progressive discipline system in place in order to address inappropriate behavior or substandard performance. (Doc. 56-1, p. 68). The process could include "a verbal warning (documented in writing), a written warning (accompanied by verbal discussion(s)), a performance improvement plan (PIP), a probationary period, an unpaid suspension, and/or termination of employment." (Doc. 56-1, p. 68). The Army could "bypass any or all of the progressive discipline process in consideration of the severity, frequency, and/or combination of infractions." (Doc. 56-1, p. 68). Certain conduct could cause an employee to lose her job "on the first occurrence because of [its] negative impact on the ministry." (Doc. 56-1, p. 68).

and stated:  "We want you to know that we have been very patient with you in addressing our concerns about the store.  We still need to discuss the issue of clothing sitting in your back room for a week at a time . . . please ensure your staff and beneficiaries are trained in putting clothing in order and colorizing the racks. As we noted last week, this is not being accomplished."  (Doc. 52-5, p. 47).  Captain Lewis asked Ms. Smith to provide a written plan to ensure proper staff training.  (Doc. 52-5, p. 47).  Captain Lewis copied Ms. Peterson on the message.  (Doc. 52-5, p. 47).

At 6:30 a.m. on January 5, 2017, Ms. Peterson texted Ms. Smith to alert her that she and Captains Preston and Karen Lewis were planning to visit the store to give her (Ms. Smith) a written warning.  (Doc. 64-42, p. 43).  Ms. Peterson indicated that Ms. Smith's assistant manager would receive a similar written warning and another employee would be terminated for "[lying] about things in her background check."  (Doc. 64-42, p. 44).  Ms. Peterson told Ms. Smith to make sure the back of the store was clean and to "make sure no old weeks in furniture, pictures, and clothes."  (Doc. 64-42, p. 45).  Just after 12:30 p.m., Ms. Peterson sent Ms. Smith a text message to let her know that she and the Lewises were coming to the Hoover store "around 4pm to see u."  (Doc. 64-42, p. 48).

When Captains Preston and Karen Lewis and Ms. Peterson arrived at the Hoover store, Captain Preston Lewis began to discuss the warning with Ms. Smith, but before he could give an explanation, Ms. Smith stated that the store was "a lot

more work than [her] last one" and that she "never wanted th[e] store to begin with."
(Doc. 52-5, p. 50).  She stated that she had been in retail for 27 years, and she knew
what she was doing.  (Doc. 52-5, p. 50).  After Captain Lewis began to explain the
clothing issues that the warning was meant to address, Ms. Smith stated that she was
giving two-weeks' notice, and she requested two weeks of vacation pay.  (Doc. 52-
5, p. 50; Doc. 52-5, p. 52; Doc. 51-2, p. 52, tpp. 199–200).  At Captain Lewis's
request, Ms. Smith wrote a resignation letter.  (Doc. 52-5, pp. 50, 52).  Ms. Smith
said, "this is racism."  (Doc. 52-5, p. 50; *see also* Doc. 64-50, p. 54, tp. 207).  Mr.
Lewis accepted her resignation and asked Ms. Peterson to escort Ms. Smith out of
the building.  (Doc. 52-5, p. 50).  At 6:05 p.m., Ms. Peterson texted Ms. Smith:
"Proud of u!" (Doc. 64-42, p. 49).  Ms. Smith responded:  "thanks, I'm proud of me
too .. So hard to take it when you know you're being done wrong .. and for the second
time."  (Doc. 64-42, p. 49).  Ms. Peterson replied:  "Yes I know that was tough.  I
just tried to play along LOL."  (Doc. 64-42, p. 49).

After Ms. Smith resigned, The Salvation Army hired Anthony Nihiser, a
Caucasian, as manager of its Hoover store.  (Doc. 51-85, p. 26, tpp. 101-02).  When
Mr. Nihiser left, Brian Finn, Caucasian, replaced him as manager.  (Doc. 51-85, p.
26, 29, tpp. 103-04, 116).

After she resigned from The Salvation Army, Ms. Smith filed EEOC charges
against The Salvation Army on January 19, 2017 and February 9, 2017.  (Doc. 51-

16; Doc. 51-17).  Ms. Smith alleged that she was discriminated against based on her race and sex and that she was retaliated against for complaining about the "blackface" Styrofoam head.  (Doc. 51-16; Doc. 51-17).  Ms. Smith filed this action on March 15, 2017.  (Doc. 1).[20]

## III.

### *Race Discrimination*

Title VII makes it unlawful for an employer to discriminate against an individual "with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  Section 1981 guarantees to all citizens "the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . ."  42 U.S.C. § 1981(a).

Ms. Smith pleaded Title VII and § 1981 race discrimination claims together in the first count of her amended complaint.  (Doc. 36, pp. 14-22).  There, she alleges that her race was "a motivating factor" in The Salvation Army's decision to discriminate against her.  (Doc. 36, p. 19).  In her brief in opposition to The Salvation Army's summary judgment motion, Ms. Smith argues that her race discrimination

---

[20] The Court consolidated this case with another action Ms. Smith filed.  (Doc. 33).  Ms. Smith filed an amended complaint to aggregate the claims in the two cases.  (Doc. 36).

claims rest on a mixed-motive theory. (Doc. 65, pp. 10-12, 21-23). The allegation and argument are fatal to Ms. Smith's § 1981 race discrimination claim because a § 1981 race discrimination claim may not rest on a mixed-motive theory. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).[21]

To pursue her Title VII race discrimination claim, Ms. Smith must offer "'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [race] was *a* motivating factor for the defendant's adverse employment action.'" *Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)) (emphasis in *Quigg*); *see also* 42 U.S.C. § 2000e–2(m). Motivating factor evidence may be direct or circumstantial. *Quigg*,

---

[21] In its initial summary judgment brief, The Salvation Army did not address Ms. Smith's § 1981 claims. (Doc. 52). The Salvation Army argues that its request in its motion for judgment in its favor "on all of Plaintiff's claims," (Doc. 51, p. 3), suffices to extend the Army's Title VII arguments to Ms. Smith's § 1981 claims because the "elements and analysis of race claim under 42 U.S.C. § 1981 are the same as those in a race claim under Title VII," (Doc. 87, p. 5). Alternatively, the Army asks the Court to consider a supplemental summary judgment brief that addresses Ms. Smith's § 1981 claims. (Doc. 87, p. 6). The Court notes that Ms. Smith seems to have understood that The Salvation Army was moving for judgment in its favor on her Title VII claims and her § 1981 claims because she argued about both statutes in her opposition brief. (Doc. 65, pp. 9, 22). Though The Salvation Army's "all claims" argument finds some support in case law, *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009), the Court opts to examine the viability of Ms. Smith's § 1981 discrimination claim following the *Comcast* decision pursuant to Rule 56(f). As the Court explained in a transcribed hearing in this matter, if the Court does not resolve Ms. Smith's § 1981 race discrimination claim now based on *Comcast*, then the Court will have to do so at the conclusion of Ms. Smith's case at trial. (December 21, 2022 docket entry; transcript available upon request). The Court believes the better option, and the option that conforms to Rule 1 of the Federal Rules of Civil Procedure, is to address the issue now.

814 F.3d at 1237 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003)).

With respect to the adverse employment action element of her claim, Ms. Smith acknowledges that she resigned from The Salvation Army, but she argues that her resignation amounts to an adverse employment action because intolerable conditions at the Hoover store compelled her resignation.  Ms. Smith argues that because Ms. Peterson did not report or investigate her complaints of race discrimination, her "only option to avoid discrimination was to resign."  (Doc. 75, p. 4); *see also* (Doc. 65, p. 18) (explaining that Ms. Smith complained to Ms. Peterson about race discrimination "numerous times," and Ms. Peterson "started grooming her on how and when to resign" and did not report Ms. Smith's concerns up the chain of command).

"'Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)).  To establish constructive discharge, a plaintiff must demonstrate that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Bryant*, 575 F.3d at 1298; *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) ("In evaluating constructive discharge claims, we do not consider the plaintiff's

subjective feelings.  Instead, we employ an objective standard.").  "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim."  *Bryant*, 575 F.3d at 1298 (citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992)).

Ms. Smith's evidence of unbearable work conditions consists largely of increased scrutiny of her work and, viewing the evidence in the light most favorable to Ms. Smith, unreasonable requests and criticism concerning mundane, inconsequential store conditions.[22]  The Eleventh Circuit has held that heightened scrutiny of an employee's work is not sufficient to establish a hostile work environment claim, *Harbuck v. Teets*, 152 Fed. Appx. 846, 848 (11th Cir. 2005), so the evidence necessarily is inadequate to support a claim of constructive discharge. *See Little v. Peach County School Dist.*, 2009 WL 198003, *11 (M.D. Ga. Jan. 27, 2009) (increased supervision and heightened scrutiny of employee is not an adverse employment action); *Kristoff-Rampata on behalf of Lombardo v. Publix Super Markets, Inc.*, 2017 WL 4287881, *6 (M.D. Fla. July 28, 2017) (increased and frequent supervision insufficient to establish constructive discharge); *Gilbert v.*

---

[22] This characterization of the evidence likely stretches the concept of viewing the evidence in the light most favorable to the non-movant to its outer limits.  It is objectively reasonable to point out to a store manager that she should open additional registers when more than 30 people are in line to check out in a retail store.  Moreover, when Ms. Peterson texted Ms. Smith to let her know that Captain Preston Lewis was coming to visit the Hoover store, Ms. Peterson would urge Ms. Smith to make sure she had cleaned her store and sorted old clothes.  Ms. Smith does not characterize Ms. Peterson's recommendations as onerous or unreasonable.

*Stony Brook University*, 2022 WL 409716, *12 (E.D.N.Y. Feb. 10, 2022) (citing as evidence of intolerable work conditions "email tantrums" and stating that "to the extent Gilbert was unhappy with any increased supervision, micromanagement, busywork, or meetings, such dissatisfaction does not, by itself, support a constructive discharge claim") (internal marks and citation omitted); *see generally Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001) (holding that day-to-day criticism, even if unwarranted, without more rarely will establish an adverse employment action for purposes of Title VII), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) .

The verbal and written warnings that Ms. Smith received from Captain Preston Lewis, when coupled with Preston and Karen Lewis's increased scrutiny of Ms. Smith's work, still do not rise to the level of constructive discharge. For a race discrimination claim, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). For example, "memoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions." *Davis*, 245 F.3d at 1236. Captain Preston Lewis gave Ms. Smith a verbal warning on December 1, 2016, and he planned to give her a written warning on January 5, 2017, but Ms. Smith preempted the warning when she gave Captain Lewis two-weeks'

notice of her resignation.  A reasonable person in Ms. Smith's position would have attempted to improve upon the conduct that her supervisor critiqued in his warnings and would have documented her efforts to comply with instructions; a reasonable person would not resign after a second warning, even if she were concerned – as any reasonable employee would be – that additional warnings might lead to more serious consequences.

Between September 2014 when she joined The Salvation Army and January 2017 when she resigned from the Army, Ms. Smith received only one adverse consequence; Captain Matthews suspended her for three days without pay in February 2015.  Ms. Smith did not lose benefits or promotional opportunities because of the suspension.  In fact, several months after the three-day suspension, Ms. Smith received a favorable transfer to The Salvation Army's Hoover store.  A $2.00 per hour raise accompanied the transfer.  Between February 2015 and January 2017, Ms. Smith suffered no tangible adverse consequences other than increased oversight and email inquiries from Captains Preston and Karen Lewis and one verbal and one written warning from Captain Preston Lewis.

Moreover, the increased scrutiny that Ms. Smith received from Captains Preston and Karen Lewis in late 2016 was offset by notice that Ms. Smith received from her friend in HR, Ms. Peterson.  Ms. Peterson would text Ms. Smith to let her know when the Captains were coming to inspect her store and would let Ms. Smith

know if the Captains planned to criticize store conditions so that Ms. Smith could react appropriately. Ms. Peterson would advise Ms. Smith to implement the action items that the Captains had given on previous visits so that the Captains would not be able to cite Ms. Smith for failing to carry out their instructions. Ms. Peterson encouraged Ms. Smith to resign, knew that Ms. Smith was starting a new job in January 2017, and offered Ms. Smith advice about the lawsuit that Ms. Smith planned to file against The Salvation Army. (Doc. 64-42). This unusual circumstance makes it particularly difficult for Ms. Smith to establish that she was constructively discharged.

Ms. Smith's argument that she had to resign because Ms. Peterson did not report or investigate her complaints of race discrimination is puzzling. To accept the argument, the Court would have to turn a blind eye to the fact that Ms. Smith and Ms. Peterson were working together to put Ms. Smith in a strong position to sue The Salvation Army. Recall that in April of 2016, Ms. Peterson gave Ms. Smith notice that Captains Preston and Karen Lewis were planning to raise Ms. Smith's hourly wage to $15 per hour if Ms. Smith would agree to manage the Hoover store. Ms. Peterson urged Ms. Smith to think carefully before accepting the opportunity because doing so would "make [Ms. Smith's] lawsuit weak against [The Salvation Army] if u accept." (Doc. 64-42, p. 3). Ms. Peterson did not ignore Ms. Smith's complaints of racism; Ms. Peterson simply advocated for litigation rather than

32

internal efforts to address Ms. Smith's complaints.  Ms. Smith followed the advice of Ms. Peterson and her lawyer and maximized her time at The Salvation Army so that she could use her vacation leave before she resigned to start her new job.  The Court must view the evidence in the light most favorable to Ms. Smith, but the Court is not obliged to overlook text messages from Ms. Smith's friend in HR that contradict Ms. Smith's contention that her friend's failure to report her complaints of racism made the conditions of employment intolerable.  *See generally, Crenshaw v. Lister*, 556 F.3d 1283, 1291-92 (11th Cir. 2009) (reversing order denying deputies' motion for summary judgment on basis of sovereign immunity in part because information in police reports refuted the plaintiff's conclusory allegations and governed the immunity analysis); *Gogel v. Kia Motors Manu. of Ga., Inc.*, 967 F.3d 1121, 1145 (11th Cir. 2020) (explaining that an HR employee is "expected to interact with complaining employees in an effort to internalize the resolution of any complaint and thereby avoid, if possible, the external resolution of that complaint, such as the filing of an EEOC charge and a subsequent lawsuit.").

    In any event, an employer's failure to investigate an employee's complaint is not an adverse employment action for purposes of a discrimination or a retaliation claim if the failure to investigate did not harm the complaining employee.  *See Entrekin v. City of Panama City Fla.*, 376 Fed. Appx. 987, 995 (11th Cir. 2010).  Here, Ms. Smith was planning to leave The Salvation Army before she began

complaining to Ms. Peterson about Captain Preston Lewis's frequent email messages, and Ms. Peterson was helping Ms. Smith plan her departure and prepare her lawsuit against The Salvation Army.   Ms. Peterson's failure to report Ms. Smith's complaints of harassment to Mr. McAfee did not harm Ms. Smith.[23]

Because Ms. Smith resigned and cannot on the record in this case establish constructive discharge, the Court will grant The Salvation Army's motion for summary judgment on Ms. Smith's Title VII race discrimination claim. [24]

*Retaliation*

Under Title VII, it is unlawful for an employer to retaliate against an employee because the employee opposed an unlawful employment practice or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

_____

[23] The Salvation Army investigated Ms. Smith's complaint of discrimination in her 2015 EEOC charge.  (Doc. 52-4).

[24] Even if *Comcast* did not warrant judgment in favor of The Salvation Army on Ms. Smith's § 1981 discrimination claim, Ms. Smith's inability to establish an adverse employment action is fatal to her § 1981 discrimination claim.

The Court notes that Ms. Smith fared better than Mr. Fernekes, who is Caucasian, as manager of the Hoover store.  Shortly after Captains Preston and Karen Lewis began supervising Mr. Fernekes at the Hoover store, they began giving him warnings.  In the lead-up to a written warning on October 5, 2015, Mr. Fernekes received from Captain Preston Lewis a warning in July 2015, a warning in August 2015, and two warnings in September 2015.  (Doc. 64-75, pp. 10-11, tpp. 38-39, 41-42; Doc. 64-80).  As noted, by October 2015, Captains Preston and Karen Lewis were visiting the Hoover store almost daily.  (Doc. 64-75, p. 10, tp. 40).  Mr. Fernekes received additional warnings on October 10 and November 3, 2015.  (Doc. 64-75, p. 11, tpp. 41-42).  He received a final written warning on November 10, 2015.  (Doc. 64-75, p. 11, tp. 41).  In December 2015, Mr. Fernekes either was fired or resigned because he knew that Captain Lewis was planning to fire him.  (Doc. 51-2, p. 34, tpp. 126-27; Doc. 64-75, p. 12, tp. 45).  This evidence undermines Ms. Smith's contention that Captain Preston Lewis's criticism of her management of the Hoover store was racially motivated.

hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "Retaliation claims are also cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims." *Gogel*, 967 F.3d at 1134.

"A plaintiff alleging retaliation in violation of Title VII 'must begin by establishing a *prima facie* case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'" *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997)). Ms. Smith engaged in statutorily protected activity when she complained in a February 2015 disciplinary notice that she was being discriminated against, filed an EEOC charge in February 2015, and complained about the offensive "blackface" statue in October 2016. Thus, Ms. Smith can establish the first element of a *prima facie* case of retaliation.

Ms. Smith's argument concerning the second element of her *prima facie* case falls short. For purposes of a retaliation claim, the adverse employment action standard "protects employees more broadly—and is more easily satisfied—than the standard applicable to claims of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). In the context of a retaliation claim, mistreatment

of an employee who has engaged in protected conduct "is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Monaghan*, 955 F.3d at 861 (quoting *Burlington Northern*, 548 U.S. at 68).

In her brief in opposition to The Salvation Army's summary judgment motion, Ms. Smith did not distinguish between her discrimination and retaliation claims and offered the same discussion of constructive discharge as an adverse action as to both. (Doc. 65, pp. 9-23).  In a supplemental submission that she filed after the United States Supreme Court issued the *Comcast* decision, Ms. Smith stated that she received "nine(9) emails/coachings after she complained of 'blackface,'" and argued that she was "retaliated against by Captain Lewis to the point where she felt she had no viable alternative but to resign."  (Doc. 75, p. 4, ¶ 11).  Because the Court has found that Ms. Smith cannot establish constructive discharge on the record in this case, her argument in opposition to the Army's motion for summary judgment on her retaliation claim fails.

In her summary judgment briefs, Ms. Smith did not raise the *Burlington* "well might have dissuaded" standard, and she did not argue that evidence short of constructive discharge could suffice to establish the adverse employment action element of her retaliation claims.  To oppose The Salvation Army's motion for

summary judgment on her retaliation claims under the *Burlington* standard, Ms.
Smith would have had to persuade the Court that fewer than 10 email messages over
the course of just over one month (some of which were supportive or neutral) and a
verbal warning and a written warning in a month's time would have dissuaded a
reasonable worker from making a charge of discrimination.   The Salvation Army
would have had the opportunity to respond to this argument, and the Court would
have had to determine whether Ms. Smith's evidence of mistreatment was adequate
to create a jury question as to her retaliation claim.   A party "cannot readily complain
about the entry of a summary judgment order that did not consider an argument they
chose not to develop for the district court at the time of the summary judgment
motions."   *Johnson v. Board of Regents of Uni. of Ga.*, 263 F.3d 1234, 1264 (11th
Cir. 2001).[25]

---

[25] In her amended complaint, Ms. Smith described the mistreatment she suffered this way:  "her
authority as manager of her store was undermined, she was purposefully denied the opportunity to
fully perform her job, and she was subjected to manufactured criticism of her job performance."
(Doc. 36, p. 34, ¶ 213).   These allegations are not sufficient to establish an adverse employment
action under the *Burlington* "well might have dissuaded" standard because "[a]n employee's
decision to report discriminatory behavior cannot immunize that employee from those petty slights
or minor annoyances that often take place at work and that all employees experience."   *Burlington
N.*, 548 U.S. at 68 (citing 1 B. Lindemann & P. Grossman, EMPLOYMENT DISCRIMINATION LAW
669 (3d ed. 1996)).   Some district courts have held that written warnings may suffice to establish
the adverse employment action element of a retaliation claim because in some circumstances,
written warnings well might dissuade an employee from opposing discriminatory conduct.   *See
Curet v. Ultra Salon Cosmetics & Fragrance, Inc.*, 2022 WL 4464751, *7 (M.D. Fla. Sept. 26,
2022) ("A reasonable jury could find that the issuance of three written warnings in less than a
month's time 'well might have dissuaded a reasonable worker from making or supporting a charge
of discrimination.'"); *Hyde v. Storelink Grp., Inc.*, 2009 WL 259392, *4 (M.D. Fla. Feb. 3, 2009)
("A reasonable jury could decide Jaspan's write-ups of Hyde were 'materially adverse' to her
under the relaxed standard set forth in *Crawford* in that they might well have dissuaded a

# CONCLUSION

For the reasons discussed above, by separate order, the Court will enter judgment for The Salvation Army on Ms. Smith's Title VII and § 1981 race discrimination and retaliation claims.

**DONE** and **ORDERED** this February 27, 2023.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

reasonable worker from making or supporting a charge of discrimination."). The Eleventh Circuit revised the adverse action standard for retaliation cases in *Crawford* well before Ms. Smith filed her lawsuit, so Ms. Smith's omission of the argument from her briefs suggests that she knowingly abandoned the argument. *Crawford v. Carroll*, 529 F.3d 916, 974 (11th Cir. 2008). Had she presented an argument based on the *Burlington* "well might have dissuaded" standard, to proceed with her retaliation claims, Ms. Smith would have had to identify evidence from which jurors could conclude that her complaint to Captain Preston Lewis about the blackface statue was a but-for cause of the warnings that he issued to her on December 1, 2016 and January 5, 2017. *Thomas v. Esterle*, 2022 WL 2441562, *1 (11th Cir. July 5, 2022) ("'Significantly, when it comes to retaliation claims, a plaintiff must demonstrate that his participation in protected activity was [a] 'but-for' cause of the adverse employment action.') (bracketed word altered from 'the' to 'a' to comply with *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020))[.]") (quoting *Bailey v. Metro Ambulance Servs. Inc.*, 992 F.3d 1265, 1277 (11th Cir. 2021)). The gaps in Ms. Smith's opposition briefs are too big for the Court to fill; the Court regards Ms. Smith's retaliation claims as abandoned to the extent that they rest on a theory other than constructive discharge. *B&D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, 758 Fed. Appx. 785 (11th Cir. 2018).

38